## State *vs.* D. C. Henderson.

JULY 19, 1945.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker & Condon, JJ.

BAKER, J.   Indictment for rape.   The defendant was adjudged guilty by a jury in the superior court and thereafter the trial justice denied his motion for a new trial.   He thereupon duly prosecuted to this court his bill of exceptions which contains eighty-five exceptions, nine of which are expressly waived.   The remaining exceptions, which deal with rulings of the trial justice in the admission and rejection of evidence, the refusal to strike out testimony, the admission in evidence of certain exhibits and the denial of the defendant's motion for a new trial, are now before us for determination.

In this case the defendant admits an act of intercourse with the complaining witness but contends that it was with her consent and for a consideration.   This defense is vigorously denied by the state, which maintains that, on the contrary, the intercourse was accomplished by force and violence and against her will.   This conflict in the testimony raises the controlling issue herein.

The evidence discloses that while some of the surrounding circumstances leading up to the incident and important details thereof are the subject of conflicting testimony, certain facts relating to the occurrence itself are not in serious dispute.   In appears that the complaining witness, who was about thirty-eight years old, unmarried, and a mill worker, left her room in Providence late in the afternoon of Saturday, September 4, 1943 and spent the evening in the business district and in the stores.   Thereafter, the exact time being in dispute, she decided to visit a friend who lived on North Main street, in the city of Providence.   Complaining

witness walked in that direction, stopping at a drug store to purchase a bottle of beer for the next day. After leaving the store she wished to have a glass of beer then and there and so turned from North Main street into Smith street and next into Canal street where there was a bar and cafe in which she had been once before. This place was full when she entered and she had difficulty in finding a seat. After drinking a glass of beer, which she ordered at the bar, she left in a few minutes to go to her friend's apartment.

According to her testimony, as she walked northerly on Canal street, immediately after leaving the cafe, she heard someone following her. As she continued on her way the person in question, a soldier, who later was definitely identified as the defendant, approached and spoke to her. She asked him not to bother her, but he suddenly grabbed her hand and pulled her up a short, narrow street to an alleyway in back of the buildings on Canal street. It was very dark there. She "hollered" and the defendant then punched her hard in the face and eyes, causing her to cry. He then threw her to the ground, telling her what he was about to do. The complaining witness remonstrated and attempted to get up and get away from him but he choked her, bit her on the face and hands, placed a closed knife near her head and had intercourse with her by force. After completing the sexual act the defendant took her by the arm, got her up on her feet and pulled her further back into the alleyway and threw her to the ground a second time. He then inserted his fingers into her private parts, injuring her very severely, after which he left her.

The complaining witness, who according to her testimony did not know where she was and was confused and suffering, attracted the attention of two men, whom she saw passing a long fence, by calling to them, and she then asked for their help. At her suggestion they assisted her to the home of her friend on North Main street not far distant. She stayed there that night and in the morning she was examined by

a doctor, who found a hemorrhage of the vagina and ordered her removal to a hospital.

Another doctor, who saw her there that morning, testified that she had bruises on her legs and thighs; that her left eye was blackened; that her face was puffed from being bruised; that she had an abrasion of the left ear; that she had markings on her face and neck and a human bite on her left hand; that there was dried blood on her legs; that she was in severe pain; that she had a complete tear of the perineal body, and also a tear in the rectum of about two inches; that she was still bleeding somewhat; and that the tearing of the vagina was very extensive and serious. This doctor operated on her soon after his examination, and she remained in the hospital for about a month.

The defendant, who was about thirty-three years of age and had been stationed at Camp Myles Standish near Taunton, Massachusetts, for several months, testified in substance as follows respecting his actions on September 4, 1943 and immediately thereafter: On that day he had obtained a pass to visit Boston. In the afternoon, however, he came to Providence, having missed a bus for Boston. In Providence he first visited the home of a woman acquaintance, leaving there about dusk to go to a cafe on Canal street. At this place he drank beer at the bar and while so doing eventually saw a woman, the complaining witness, sitting at a table talking to a sailor. According to his testimony this woman came over and spoke to him as he was drinking. Later, as he was about to leave the cafe, she was near the door and he told her that he would like to have a date with her. Thereupon they talked together and the defendant testified that he changed a $5 bill at the bar and gave her $3, that price having been agreed upon by them. They then went out and into an alleyway in back of the cafe, where he had intercourse with her. At this time she was menstruating. Before engaging in the act, he unknowingly dropped from his pocket an envelope addressed to himself. This envelope, which was later picked up by the police, assisted in identify-

ing him and bringing about his arrest. He testified that after the act he left the complaining witness sitting on the ground uninjured and went back into the cafe. Soon she also returned and when the defendant finally went out she was near the door talking to the sailor hereinbefore mentioned.

After leaving the cafe the defendant states that he went to another place on North Main treet, where he had more drinks, and finally went to Boston where he remained during Sunday, September 5. He was picked up the next day by military police while on his way back to camp, being at that time over his leave.

The defendant is prosecuting some fifty-eight exceptions to rulings by the trial justice admitting testimony in evidence during the trial. It is neither feasible nor necessary to discuss in detail all these exceptions. There are, however, among them three groups which in our judgment should be referred to. During the trial a number of questions were allowed by the trial justice to be asked of a state's witness respecting the state's exhibit 16 for identification. This exhibit consisted of certain scrapings which, according to the testimony, had been taken from the defendant's fingernails on September 7 or 8. The questions objected to related to the identification of the scrapings and their condition and were merely of a preliminary nature leading up to the offering of the exhibit in evidence. The scrapings were later introduced in evidence near the end of the state's case as an exhibit after further identification. We see no error in the admission of the questions objected to. The matter was relevant upon the issue of identifying the defendant as the person who had violently attacked the complaining witness, as alleged, and also to the issue whether his conduct was consistent with merely voluntary intercourse, as he testified. The exceptions involved are numbered 35 to 40, inclusive, and they are overruled.

Questions were also allowed to be asked of a state's witness, an expert-toxicologist, in respect to alleged bloodstains

on certain clothing worn by the complaining witness and by the defendant respectively at the time of the occurrence. The defendant contends that the witness's answers were so indefinite, as to whether or not the stains were of human blood, that the examination should not have been permitted to continue along that line. It was error to permit such examination to continue when the witness stated in effect that he was not able to determine definitely that the stains were human blood. But this error was harmless, in our opinion, because the series of questions complained of brought out only that the witness could not positively state that the stains were human blood. This evidence could not be prejudicial to the defendant. These exceptions are numbered 45 to 49, inclusive, and 54 and 55, and they are overruled.

The defendant argues strongly that the trial justice committed error in allowing defendant to be asked the following question in cross-examination: "Well let me ask you, did you know that you had done wrong when you were in the alleyway with a white woman?" The defendant maintains that this question served to inflame and prejudice the jury's mind against him, and that he had not necessarily done wrong in being in an alleyway with any woman, white or otherwise. In our opinion the question was unfortunately framed, but it does not follow that it necessarily emphasized the fact that the woman in question was white. The conduct with which the defendant was actually charged would, of course, have been unlawful irrespective of the color of his woman companion. However, it is reasonably evident that the examiner had fashioned his question in view of certain of the evidence which had gone before. A question similar to this one first appeared in evidence in a written statement signed in camp by the defendant in the presence of two of his officers. In that statement the woman's color appeared but it was merely in the nature of general description for use in a military report and the question here involved was based on that report. In view of the evidence of the complaining witness's friendliness with persons of the negro

race and her social relations with them, there was, in our judgment, no question of racial prejudice in this trial. Under all the circumstances we are of the opinion that there was no reasonable possibility of prejudice against the defendant in that regard. This point is covered by exceptions numbered 62 to 64, inclusive, and they are overruled.

All the other exceptions to rulings by the trial justice admitting evidence over the defendant's objections have been carefully considered, and the court is of the opinion that they are without merit, and they are all overruled.

The defendant is pressing seven exceptions based on the exclusion by the trial justice of testimony offered by the former. Most of these exceptions relate to questions, asked by the defendant of a doctor who was a witness for the defense, regarding the extent to which a woman injured in the manner described by the complaining witness would bleed, and also as to whether or not such injuries might have been caused by voluntary sexual intercourse. Apart from the fact that the foundations for the opinions asked of the witness were limited and questionable as to sufficiency, no offer of proof was made by the defendant when the trial justice excluded the proffered testimony. Thus we have no means of knowing whether or not the answers to the questions involved would have been material to the issues and helpful to the defendant. The seven exceptions now under discussion are therefore all overruled.

The defendant has five exceptions to the action of the trial justice in refusing to strike out certain testimony. Upon examination we fail to see how the defendant was prejudiced by such action. In our opinion there is no merit in these exceptions and they are overruled.

The defendant is also urging five exceptions taken to rulings of the trial justice admitting in evidence certain exhibits presented by the state. These exhibits were a checkbook found among the defendant's belongings in his barracks bag at camp; his clothing worn by him when he returned to camp from Boston and later delivered to the Provi-

dence police; and certain scrapings allegedly taken from his fingernails.

As to the checkbook the defendant contends that it was not properly identified as his property before being admitted in evidence. After an examination of the transcript it is our opinion that the defendant's contention is not sound. There was evidence of its being found in his belongings. Moreover, the defendant himself testified as to when and how he obtained the checkbook. Therefore, if it was error to deny his motion to strike out at the time, it became harmless error on the defendant's own testimony.

In respect to the defendant's clothing, in our judgment it was sufficiently identified to warrant its admission in evidence, although the officer who personally delivered the clothing to the police was absent from the trial in the performance of duty overseas. Another officer who assisted in handling and examining the clothing, at the time it was removed from defendant's person in camp, was qualified to testify and did identify such clothing.

As to the fingernail scrapings, the defendant's position, in substance, is that, as they were not taken until September 7 or 8, three or four days after the alleged rape, they were taken too long after that event to permit of their use as an exhibit, particularly when there was no definite proof as to how his fingernails had been used in the interim. We are of the opinion that, so long as the scrapings were otherwise properly identified and traced, the defendant's objection to the exhibit goes to its weight, or to matters of defense, rather than to admissibility. We find that the ruling admitting such scrapings in evidence was without error. It is also our judgment that, in all the circumstances, it was not error for the trial justice to refuse to strike the exhibit from the record. The condition under which its admission was allowed was substantially met by the state. All the defendant's exceptions to the admission in evidence of the above-mentioned exhibits are overruled.

There remains for consideration the exception to the de-

nial by the trial justice of the motion for a new trial. The defendant vigorously contends that the evidence does not support a finding that he was guilty as charged beyond a reasonable doubt, and that the jury's verdict was the result of prejudice against him because of his color. In support of his position he points out certain inconsistencies in the complaining witness's testimony and certain facts from which he draws inferences throwing doubt upon her credibility. In this connection, however, it may be noted that it clearly appears from the transcript that the complaining witness was of limited intelligence and spoke English imperfectly. These matters were all before the jury when they decided that the defendant was guilty beyond a reasonable doubt and there is no basis in the record for assuming that they did not weigh all the facts and circumstances in evidence in arriving at that verdict or that their verdict resulted from prejudice.

The trial justice filed a rescript sustaining the defendant's conviction and approving in strong terms the jury's verdict. The rescript shows a careful consideration of the issues raised by the defendant's motion for a new trial and the exercise by the trial justice of his independent judgment. In doing so he has not misconceived the law or overlooked any material evidence. We have considered the evidence and we cannot say that the finding of the trial justice denying this motion was clearly wrong, or that the record supports the defendant's contention that the verdict was the result of prejudice against him. In our judgment he was fairly and impartially tried. The defendant's exception to the denial of his motion for a new trial is overruled.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for further proceedings.

*John H. Nolan,* Attorney General, *John O. Pastore,* Assistant Attorney General, *John J. Cooney,* for State.

*Joseph G. LeCount,* for defendant.